May it please the Court, Counsel. The government separated five asylum seekers from their children, created and accompanied minors and prosecuted the parents for a misdemeanor illegal entry. The Attorney General's policy to separate asylum seekers to deter asylum violates fundamental fairness and shocks the conscience. This Court has held that petitioning for asylum is a constitutionally protected right under the due process, and clearly Congress has expressed its intent with respect to asylum seekers. When an alien in this country makes a credible fear claim, he shall be referred to an asylum officer. Congress has specifically used the word shall because it is a command, it is not a suggestion. In this case, the El Paso Five Parents, as I like to call these parents. So if you could just pause one second. The clock isn't running at the moment. Thank you. You get a few extra minutes. A little dividend. The executive order that ended this, that dated in June of what, last year? June 20th of last year, right. Are you aware of any criminal cases that have had, courts have discerned any infirmity as to the conviction or sentence because of the sort of parallel civil circumstance of children? No, Judge. So this is a case of first impression? First impression, yes, Judge. The El Paso Five Parents, as I like to call these parents, were not referred to an asylum officer. They were referred to a prosecutor. The 28 day letter, the report from the officer of inspector general that we submitted that it was recently published, makes it clear that the attorney general had a policy to separate parents to deter asylum seekers in El Paso at the time. I guess I'll start with two questions. Why is it that much different than any offender that's arrested and then the children have to be separated from them and then the criminal process takes place and it's an unfortunate separation. But how is this really different than any other parent that's alleged to have committed a crime and then detained, pending trial? Because in this case, Judge, the government knew before they started the prosecution that these parents who have never been in this country before, no prior criminal history whatsoever. Right. They knew before they started the process. They recorded those claims, those credible fear claims. So the essence of your argument is there has to be a sequence and once they request an asylum determination, that has to occur before any criminal prosecution? Is that? No. What I'm saying is in this case, before, I'm just talking specifically about these cases. When immigration authorities encountered these parents, they at that time made a credible fear claim. Those claims were recorded in the immigration forms. At that time, the government needs to comply with Congress. Congress makes the laws. And Congress clearly stated its intent with respect to an alien in the country who requests asylum. At that time, when the alien makes a credible fear claim, he shall be referred to an asylum officer, not to a prosecutor like in this case. These El Paso-fied parents were referred to a prosecutor. The essence of your position, again, legally, is that the shall refer must come before, can't occur simultaneous with criminal prosecution. Is that? If the facts apply, like in this case, where the alien at the first encounter makes that claim. Why is it that the statement that has been made, at least there's been many statements made by the government along dealing with cases like yours and others, but one of the statements that the government has made repeatedly is that if you want to seek asylum, you have to come to a port of entry. You can't cross somewhere in between ports of entry. And the government has been, the United States government has been putting that forward as if you want to seek asylum, you must come to a port of entry and ask for it. Don't just cross in between. And that's a good point, Judge, except for the fact that the asylum statute, make it clear, AUSC 1158A1, makes it clear that an alien present in the country does not have to ask for asylum at the port of entry. And it makes sense, Judge, because if somebody's chasing you through the mountains, if somebody is chasing you across the ocean, it really makes perfect sense. That's what the statute says. Now, Congress makes laws, and if the Attorney General doesn't like the law, it's up to Congress to change that law. But that is what part of our argument, too, is the disregard, the complete disregard for asylum law. Take for example the case of Vasquez Hernandez. Vasquez Hernandez is one of the parents of El Paso Five. She was lucky enough that after her conviction, she went to immigration, and a non-profit organization helped her to request a bond. She lives right now in New Orleans. She has been reunited with her son, and she's in the asylum process. The other four parents were not that lucky. Nobody stepped to help them, and they were deported with other children. They have not seen their children in over a year. And the report that we submitted in a 28-day letter makes it clear that as of today, the government is still unable to account for some of the children it separated. It separated thousands of children. In this case, the government created and accompanied minors, prosecuted the parents, and completely — Did the 1325 misdemeanor convictions spur or contribute to the removal? Or were the removals independent of the misdemeanor convictions? Well, Judge, one event led to another. Obviously, the prosecution led to the conviction, and the conviction led to the deportation. And in this case, four parents — we know. I was the attorney at the trial, and I have kept contact with my clients. My clients are still in Central America, and their children are here in the United States. And they have not seen their children for over a year. So the punishment was not just probation, the judgment on probation. That was just on paper. In reality, what happened is this indefinite separation. This separation — The criminal record before us, the sentence was to BOP. It didn't in any way obligate the government to deport. You're saying that's just — that's sort of what happens. But when we look sort of at the judgment and conviction, it's a BOP prison term. Usually, the government deports convicted people, Judge. Usually, that's the natural sequence. Those convictions could have been avoided. That punishment, Judge, was unnecessary, because if the government had complied with the asylum law, these parents would have been referred to an asylum offer. The punishment of not seeing your child for a misdemeanor is grossly out of proportion. In addition, Judge, the government acted in bad faith. At one point, on the record, and I know because I was there, the magistrate asked in confusion, hey, why are we doing this? Why are we separating children and prosecuting parents? Is there a new policy in place? And the government, on the record — I encourage you to go to the record and see what the government responds. Oh, there's no policy. Now the report from the Office of Inspector General makes it clear that, yes, they knew there was a policy in place to deter asylum seekers. But that is — Do you have any authority in any context where the remedy for some sort of improper detention or any improper pretrial process like that is vacating the conviction? No, Judge. And right here, Judge, it's going to be a paramount task for these parents in Central America to be reunited with their children, because they don't have the means to come to the United States. They don't have the means — they're indigent parents. They don't have the means to have their children fly. But what we can do is to start with doing the right thing and reversing those — Well, I understand the challenge. I mean, it's — there's some heartbreaking stories. The normal rule is, if there's something improper about your detention — say, just a regular, you know, firearms case — someone's detained pretrial. Once they're convicted, the normal rule is they can't complain about the detention, pretrial detention, being improper anymore. So I'm just trying to figure out how we get around that principle. Well, Judge, I would point that out, and I would argue that here the indefinite separation at the pretrial stage violated due process. To determine whether pretrial punishment violates due process, we look at congressional intent again. And in this case, Congress has clearly expressed its intent with respect to bona fide parents like the El Paso Five. When they made a credible fear claim, at that time they should have been referred to an asylum officer to — not to get asylum, but to evaluate the claim. And let's keep in mind that these parents have never been in the United States. They have no prior criminal history whatsoever. And still, they were referred to a prosecutor, and they were convicted, Judge. Was — I guess I didn't look for — there must have been a 3142 detention hearing in this case. Was it just the government said risk of flight, and there — and did you — I was — yeah, there was — there was a risk of flight. We were appointed at the time when the — because there are misdemeanors, and I — It's a misdemeanor offense, and 3142 contemplates a lot of factors, including family ties. And you would think some of this — what I noticed was the trial was stipulated, and then the dismissal motion you filed, there was no hearing. So no evidence really exists about this interlocking theory you've got of — of sort of civil removal pleadings somehow infecting. And now that I'm thinking about it, it probably would have come up at the detention hearing.  No, we — I became a counsel at the — shortly after the initial detention, I filed a motion to dismiss, and we had a hearing on the motion to dismiss. There was no evidence taken. So ORR, which is sort of the mystery entity here, we just don't really know much about — Well, what we know is that it is a government agency. Yes. And we know that the government is obligated to find out any favorable evidence in the agencies working for the government. And in this case, the government knew of the existence of these children. The government knew that they were the real children of the parents, and they knew that they were with ORR. Now, the Office of the Inspector General report makes it clear now that it's highly likely that they maybe didn't know where the kids were because — But even the executive order in place now just says, to the extent possible, pending a criminal case, house them together. So let's imagine post-June of 2018, they just don't have space at El Paso or wherever the facility is. Would you say those are all — all those convictions, therefore, had the same infirmity that you're arguing? What I'm saying, Judge, is that Congress has clearly expressed its intent — Shall refer. — to respect the asylum. What I'm saying here is that we have five parents convicted of a misdemeanor — Yeah. — as a misdemeanor offense, and all these could have been avoided if the government would have complied with Congress' mandate. Again, if the government doesn't like the law, if the Justice Department doesn't like it, the Attorney General, it's up to Congress to do something, Judge. But the way the law is, is they should have been referred to an asylum officer. In closing, Judge, this policy by the Attorney General shucks the conscience. It is — my clients have suffered. I cannot imagine taking your child away indefinitely from you for the commission of a misdemeanor, which could be a parking ticket. That punishment is inhumane, Judge. And so, for those reasons, I'm going to respectfully request that you reverse their convictions, that we do the right thing, the just thing to do. Thank you. Thank you, Counsel. You have time reserved. Mr. Stelmach. Thank you. May it please the Court. Of all the issues that have been raised, I heard just two that were argued here today, that separation, pretrial separation, violated due process, and then also the outrageous government conduct doctrine. So I'll confine my comments to those two issues, unless the Court has any other questions. Judge Hankinson, this may not — this is kind of out of order, but you asked about the detention hearing. They were given a $5,000 bond. Now, you know, of course, they are poor people, and that was a lot of money, but they were given a $5,000 bond. Did the issue of the children come up at the detention hearing, to your recollection? Yeah. They talked about the children and how to communicate with them, and the government was — or the prosecutor talked about the ability to contact the children through ORR. And none of these five children are unaccounted for. None of these five children are lost. Did the government dispute that they were the children of the five throughout? Well, one was a grandchild, but no, the government doesn't dispute that they were. The counsel talked about Bianca Hernandez-Vasquez's child being here in New Orleans. That's not in the record, but if — I could tell you where all these children are, if the Court is interested. Well, maybe just focus on the legal arguments. Yeah, all right. The argument is separation from the children was punishment in violation of due process. But the separation — and as a preliminary matter, in the briefs, they talk about this being in violation of the zero tolerance policy. The zero tolerance policy was from the executive order of April the 6th of 2018. These arrests were in October of 2017. So they weren't within the zero tolerance policy. But they were — there was an attorney general memo that's available on Westlaw on 4-11-17 that did call for renewed commitment to criminal immigration enforcement and required each district to submit guidelines for that enforcement. Here the separation occurred because of the criminal charges. The children couldn't be detained in the El Paso County Jail with the parents. The primary argument on this issue is that after they had requested asylum, that under the statute they shall be referred to an immigration officer, nothing in the asylum statute or the regulations requires suspension or preclusion in favor of the asylum process. And that Brazula case directly talks about this issue. It talks in broad language about the separate tracks of the criminal asylum proceeding — or, I'm sorry, the civil asylum proceeding and the criminal proceeding, the separate tracks that don't intersect. Brazula involved even stronger language that they should be immediately referred. Here it's just shall be referred. There's no legal authority for pausing or collaterally impacting a criminal proceeding until the interview takes place. There's no mechanism for interference with a 1325 prosecution or a 1325 — I think the issue first came up when the magistrate was assuming, naturally, given the facts of the case, that there would be guilty pleas. Yes, exactly. Would the government agree that it would be very difficult to have a re-arraignment hearing if the person pleading has been unable to reach their children, which the government and the children — I would think an involuntariness issue. Of course there would be huge pressure to plead guilty if at the same time the government is holding your children in a place you don't even know about. Exactly. So do you agree that the pre-existing policy that applied here, or even the current policy that only requires the government to the extent possible to house them together, is in pretty sharp tension with any ability to accept a guilty plea from a misdemeanor 1325 arrestee? You're speaking about the main issue that was before the district court, that it was coercing the guilty plea, but that issue was abandoned on appeal. That issue hasn't been — No, I'm asking you for your view. How could you take a guilty plea from a misdemeanor if at the same time you've got that person's child and they can't reach them? Would you think that guilty plea could be voluntary? I disagree that they couldn't reach them. They're a procedural — But where in the record does it establish that any of the five ever spoke to the children? Everything you've said, you hit the nail on the head. There's no factual hearing. No, I'm asking you, where in the record is there support for your statement, for your insinuation that they could speak to the children? Where can we find any assurance of that? You'd find assurance of that through the ORR regulations and their procedures, which are available but are not — So the ORR regs give you an 800 number, but nothing in this record suggests that the prosecutor at any hearing or anyone had ever said to any of these five, here's how you can reach your child. Other than through — The 800 number. The 800 number that's given to everybody. As to the outrageous government conduct theory, obviously its origins are in the two Supreme Court cases of Russell and Hampton, and they occur within the context of entrapment. There's no case in the Fifth Circuit dismissing an indictment or overturning that conviction on the basis of outrageous government conduct. The handful of cases in other circuits are in the entrapment context, as most assertion are. There's no entrapment idea here. And the argument is that being deported without their children is what constituted the outrageous government conduct. But Homeland Security and ICE removed these four parents while they were in immigration custody. This is after the trial, after the conviction, and after the judgment. Any remedy they have would be entirely civil. All of the cases you look at, every single outrageous government conduct case that you would look at involves conduct before the offense or during the offense or at trial. None involve post-judgment conduct. And that's because the Russell formulation is that due process principles bar the government from invoking judicial process to obtain a conviction. All of this removal occurs after, long after the conviction's been obtained. You ask Judge Higginson, were they removed because of the crime, the conviction? Now those records are not, the immigration records are not in the record either. But under the statute 1182.6.A.1, they're removable because they entered at a place other than a port of entry. Also for the outrageous government conduct, there must be prejudice as to the ability to obtain a fair trial. Well, the removals took place after the trial, so it had no, it could have no impact on their ability to obtain a fair trial. Unless the court has questions about any other issue, that's all I have. The only, the only other issue I was curious about was the Brady one. If instead of a stipulated trial, the government had put on the arresting officer who had said, yes, they admitted to all the elements of misdemeanor upon arrest, how would it work? At that point, would you agree that the children elsewhere in the civilian, civil entity side of the government could become people with Brady information? If the defendant's response was, we were never Mirandized, and therefore the only other witness would be the child that had been separated. Could you see that Brady would be triggered? That's a hypothetical situation that could occur. Here, they were tried on stipulated facts that did not contest at all. You can see that a person separated at the arrest moment could easily have favorable information, and anything that ORR has would be attributed to the prosecutors. Favorable information about being found in the United States. Or my hypothetical was, let's say, there was the, it became up a Fifth Amendment issue as to whether Miranda warnings were given or not. The government. But then the government didn't rely on any of their confessions. I know. That's not what happened here. I asked you to assume that something like that would happen. My point again is, just as in the guilty plea context, so too in a trial, one could easily see that a policy of separating a precipient witness could have constitutional implications. Either to voluntariness of the plea, or even to due process Brady concerns at trial. It may not be the facts of this case, but it could. It may not be the facts of this case. Okay. Thank you, Counsel. But in the larger sense, although your question didn't talk about the merits of the Brady, here there are zero merits of the Brady. There was no suppression of the children. They could have been subpoenaed. They never attempted to subpoena the children as witnesses. The defendants knew of the same evidence that the children knew. And the evidence that's talked about as to what the children knew are not about Miranda. It's about the defense of duress. And the defense of duress can't be employed here, because it requires an immediate threat. So your brief went into that. Yeah. Thank you, Counsel. All right. Thank you, Your Honor. Just briefly, Judges, with respect to Brady, Judge, these children were eyewitness children. They were with the parents from the minute they left Central America until they were arrested in the United States. They were at the scene of the alleged crime, the illegal entry. They were key witnesses. Unfortunately, the government took the position that they were not obligated to provide us with any information. And the magistrate accepted the government's position. In the record, the magistrate stated, and I quote, lamented. He used the word lamented. I lamented that I cannot give you any information about your children. At what point did you first argue that the children were key witnesses? Right at the motion to dismiss. As soon as I came on board, I filed a motion to dismiss, and I argued it right there. And just briefly, so that my time doesn't expire, the report that we attach in our 28-day letter makes it clear that the attorney had this policy to separate, to deter asylum seekers. And essentially, that's a bar to asylum. And by statute, 1150A D5B, the attorney cannot implement any policy that is contrary or inconsistent with the asylum statute. With respect to Brizuela, the case the government just referred to, let's be mindful that that case is non-published. Number two, that's not a family separation case. Number three, that alien had a prior removal. And number four, and most important, he had a prior aggravated felony, which by statute disqualifies him. AUSC 1150A B2BI disqualifies somebody of this type of offense from obtaining asylum. So it's not on point, and with respect to the fact that the children were not there, it basically put the parents in a position where they could either plead guilty or go to trial without any witnesses. Again, judges, taking your child for a person of a misdemeanor is inhumane, so I respectfully request that you reverse their convictions. Thank you, judges. Thank you, counsel. We will